UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


EUGENE LONG,

      Plaintiff,

v.                         CIVIL ACTION NO. 2:09-CV-00349

CLYDE BLAIR

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>


      Pending are defendant Clyde Blair's motion for summary judgment filed March 1, 2010, and plaintiff Eugene Long's motion to amend the complaint filed February 28, 2010.


I.


      Long is an Ohio citizen.  He is the only surviving sibling and common law heir of the decedent, Loretta Marie Miller ("Miller").  Blair is a West Virginia citizen residing in Mingo County.  He is the primary beneficiary of Miller's will.

      Miller and Blair were neighbors and friends in Mingo County.  When Miller was hospitalized prior to her passing, Blair cared for her.  Miller required Blair's services inasmuch as she (1) had survived the majority of her family, (2) never obtained a

driver's license, and (3) required transportation for critical basic needs, such as medical care, groceries, and banking.  The parties dispute the precise level of Blair's support to Miller. Long contends that Miller became largely, if not exclusively, dependent upon Blair.  Blair counters that Miller tended to her own affairs and required Blair's assistance only for transportation.

Miller was afflicted with a variety of medical conditions prior to her passing.  She suffered from leg pains, coronary artery disease, chronic obstructive pulmonary disease ("COPD"), peripheral arterial disease, type II diabetes, and hypertension.  She was prescribed a number of medications to treat most of these conditions.  She ultimately passed away on September 30, 2008, at age 86.

At some point prior to her death, Miller asked Blair if he knew any lawyers.  Blair first contacted attorney Brian Ooten with the law firm of Shaffer & Shaffer, the firm that now represents Blair.  Mr. Ooten's schedule precluded his assistance to Miller, so he suggested that Blair instead contact Greg Smith, a Mingo County attorney who handles personal injury, wrongful death, domestic relations, insurance claims, and estate matters. At all relevant times, Smith served as member of the Mingo County

Commission, the local governmental entity charged with first-line probate responsibility.

On March 20, 2008, Blair and Miller met with Smith. Blair professes an unawareness until that morning of the reason behind Miller's need for legal counsel. During the morning hours on that date, however, Miller told Blair the purpose was to "fix some papers." Blair insists that he never spoke with Ms. Miller regarding the transfer of her property.

Blair was present during Miller's discussions with Smith, during which she advised Smith she desired him to draft her will and power of attorney. While interviewing Miller, Smith testified that she told him that she had a brother, Long, but that she did not wish for him to be a beneficiary.[1] That fact does not appear in Smith's contemporaneous notes of the encounter. Miller then expressed her desire for Blair to be the primary beneficiary.

_____

[1]This alleged reluctance may have resulted from the sporadic contact between Long and Miller over the years. Long resides in Sunbury, Ohio, which is five hours away from Mingo County. He testified that he had spoken approximately five times to Miller in the last ten years. Long attributes this to his bouts with cancer in 1996 and 2006 and related health issues. Long's wife Helen maintained more frequent contact, speaking to Miller approximately three times a month over the years.

3

It is Smith's usual practice to counsel the client during the first estate planning meeting, after which the necessary documents are prepared for execution during a follow-up session. That dual-step, two-day process was merged into a single step, one-day event for Miller.[2] Smith and his assistant, Demeris Joplin, witnessed Miller's will. Blair was present in the same room during the execution ceremony, which also included creation of a power of attorney by Miller in favor of Blair.

As noted, Blair became the primary beneficiary of Miller's estate. Specifically, the will provided that Blair, who also was named as executor, would receive (1) the "monies, household furniture, household goods, automobiles, and all other . . . tangible and intangible personal properties," (2) "[a]ll

---

[2]Long suggests other irregularities respecting the events surrounding the creation of Miller's will. Typically, Smith ascertains the size of a client's estate, which Long asserts he did not do in this instance. Additionally, Long alleges that Smith took "very minimal" notes during his meeting with Miller. In response, Blair asserts that Smith had extra time available on the day of the initial meeting and, further, provided Miller the option of returning at a later time for the execution ceremony. Blair also contends that Smith (1) conversed with Miller respecting  her assets and testamentary intent, and (2) took "contemporaneous" notes during the meeting.

the rest of and residue of [her] property . . . ," and (3) "all of her "right, title and interest in any real estate . . . ."[3]

On October 9, 2008, Blair retained Smith to assist with probating Miller's will.  Smith prepared the necessary affidavits for probate purposes, which mistakenly identified Blair and Long as persons who would take upon intestacy.  Smith explained the matter as follows:

> Blair would not have taken under intestate succession. This was before I went to the new format.  Under the law it was required to list who would take under a will if there is a will and then who would take if there's not a will.  Under the newer form that I had, that I made, I listed that out more plainly, and this one, it does not do a good job of that.  But I meant . . . Blair as being a beneficiary and . . . Long as if there was not a will and if . . . [Miller's] estate would have went by intestate succession.

(Dep. of Greg Smith at 67-68).

The Mingo County Commission admitted Miller's will for probate ex parte by official order on October 9, 2008. Approximately eight days later, Long received correspondence from Smith, dated October 14, 2008, indicating that his firm was retained for probate purposes.  The letter, without specifying a

---

[3]In sum, Blair received the entirety of Miller's estate. Miller also left a certificate of deposit valued at $26,961.25 that decedent jointly owned with Dora Blevins with right of survivorship and an insurance policy valued at $28,679.14 that named Franklin Ford as the beneficiary.

deadline, advised that any probate objections should be filed with the Mingo County Clerk by the appropriate deadline.[4]

West Virginia Code § 41-5-10 requires that a probate objection be filed with the county commission prior to admission of the will and entry of an order of probate. On October 9, 2008, the Mingo County Commission entered its order for probate of the Miller will. Long was thus precluded from objecting.

On January 9, 2009, Long moved to vacate the County Commission's action. On January 14, 2009, Glen R. Rutledge, whom Long contends is a "longtime friend" of Smith and counsel to the Mingo County Commission, responded to the motion. Rutledge advised that inasmuch as Miller's will was filed ex parte, potential heirs were not entitled to notice. The response also noted that Long could have contested the matter if he had acted before the will was admitted to probate. After additionally observing that Long could appeal the probate order to the circuit court, Rutledge noted that "a hearing before the Commission would be a waste of [Long's] time and efforts."

---

[4]Long emphasizes Smith's unusual role as drafter, probate advocate, and county commissioner who, along with his fellow commissioners, bore responsibility in the county for probate matters. Smith has testified that he withdrew as Blair's probate lawyer on November 8, 2008. Additionally, he notes that he did not participate in the County Commission proceedings leading to the admission of the will into probate.

6

Miller's property was ultimately valued at approximately $1 million dollars.  The bulk of it consisted of non-probate assets, including three annuity contracts valued at $722,654.55.  On March 20, 2008, Miller named Blair the beneficiary of these annuity contracts.  Blair also received $86,431.13 from joint bank accounts held by him and Miller with rights of survivorship.

On April 8, 2009, Long instituted this action.  His complaint presently alleges two counts, namely, (1) that the will is void for failure to satisfy the formality that it be attested by two competent witnesses, and (2) that Blair exerted undue influence over Miller.

The July 28, 2009, scheduling order provided for a pleading amendment deadline of August 31, 2009, and for discovery to close on November 25, 2009.  The discovery deadline was subsequently extended twice, following joint motions requesting that relief.  The current discovery deadline expired on January 25, 2010.

On February 28, 2010, Long moved to amend the complaint.  He seeks to add a third count, alleging constructive fraud relating to the non-probate assets.  On March 1, 2010,

7

Blair moved for summary judgment, asserting (1) the will was attested by two competent witness, and (2) no undue influence was exerted.

## II.

### A.   Motion to Amend

Long moves to amend the complaint to add a claim for constructive fraud.  Blair served a copy of the estate appraisement and inventory upon Long's counsel on October 21, 2009.[5]  Long asserts that he was unaware of the size and scope of the estate, as reflected in the appraisement and inventory, at the time he instituted this action in April 2009.

Additionally, in September 2009, Long attempted to schedule Smith's deposition.  Due to calendering conflicts and inclement weather, the deposition did not take place until January 21, 2010.  Long's counsel professes that during the Smith deposition he learned further details concerning Blair and

_____

[5]Long faults Blair for a delay in submitting these reports to the Clerk of the County Commission.  The reports were due January 7, 2009, but not submitted until September 21, 2009. West Virginia law requires an executor to file these documents within 90 days of qualifying as the personal representative.  See W. Va. Code § 44-1-14(g).

Miller's relationship, including Blair's services of transporting her to her physician, checking on her frequently, and cooking for her, and eating meals prepared by her.

While Long's counsel asserts that he learned of the nonprobate assets and the possibility of a confidential and fiduciary relationship in October or November 2009, he did not believe that he possessed sufficient evidence to pursue a claim relating thereto until after Smith's deposition in January 2010.

Blair addressed the now-proposed constructive fraud count within his original motion for summary judgment, filed December 15, 2009.  It thus appears that Blair was aware by that date of Long's intention to move to amend and add that count.

As noted, the July 28, 2009, scheduling order imposed the following deadline:  "[T]he amendment of any pleading and the joinder of any party shall be completed no later than August 31, 2009."  Inasmuch as Long moves to amend beyond the deadline imposed by the scheduling order, he must satisfy the requirements of both Federal Rule of Civil Procedure 15 and 16.  See Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (2008).

Federal Rule of Civil Procedure 15(a)(2) provides as follows: "a party may amend its pleading only with the opposing

party's written consent or the court's leave.  The court should

freely give leave when justice so requires."  Fed. R. Civ. P.

15(a)(2).  Rule 16(b)(4) provides that "[a] schedule may be

modified only for good cause and with the judge's consent."  Fed.

R. Civ. P. 16(b)(4).

In recent days, our court of appeals has revisited the

settled standard governing Rule 15(a)(2):

> Although leave to amend should be "freely give[n] when
> justice so requires," Fed.R.Civ.P. 15(a)(2), a district
> court has discretion to deny a motion to amend a
> complaint, so long as it does not outright refuse "to
> grant the leave without any justifying reason."  A
> district court may deny a motion to amend when the
> amendment would be prejudicial to the opposing party,
> the moving party has acted in bad faith, or the
> amendment would be futile.

Equal Rights Center v. Niles Bolton Assocs., No. 09-1453, slip

op. at  --- F.3d ---, ---, 2010 WL 1544088, at *6 (4th Cir. Apr.

19, 2010); see also Laber v. Harvey, 438 F.3d 404, 427 (4th Cir.

2006) (citations omitted) ("A common example of a prejudicial

amendment is one that 'raises a new legal theory that would

require the gathering and analysis of facts not already

considered by the [defendant, and] is offered shortly before or

during trial.'  An amendment is not prejudicial, by contrast, if

it merely adds an additional theory of recovery to the facts

already pled and is offered before any discovery has occurred.").

Long has demonstrated good cause under Rule 16(b)(4). Once armed with the facts concerning the nonprobate assets, Long's counsel appears to have communicated his intention to amend to Blair's counsel within a matter of weeks, while discovery was ongoing.  Long's counsel refrained from moving to amend at that time, however, apparently due the high bar set by Rule 9.

It was not until January 21, 2010, that Smith was deposed.  It was at that point that Long's counsel believed he had mustered the necessary predicate for a constructive fraud claim.   The motion to amend, filed February 28, 2010, was thus seasonable.

It is the case that a brief period of further discovery, perhaps 30 days, will be necessary.  At the time Long moved to amend, however, trial was three months away.  In view of these circumstances, and inasmuch as Long's counsel forecast the possibility of the amendment approximately three months prior to seeking it, prejudice is markedly diminished.  The amendment also does not clearly appear to be futile. <u>U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008) ("[A] district court may deny leave if amending the complaint

would be futile -- that is, 'if the proposed amended complaint
fails to satisfy the requirements of the federal rules.'").

The court, accordingly, ORDERS that the motion to amend
be, and it hereby is, granted.  It is further ORDERED that the
proposed "First Amended and Restated Complaint," without the red
and blue lining appearing on Attachment D to the motion to amend,
be filed no later than the close of business on May 21, 2010.  A
revised scheduling order has been entered this same day.


B.   Motion for Summary Judgment


        1. Governing Standard


A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those
necessary to establish the elements of a party's cause of action.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a

12

light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v.

13

Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### 1.  Count One -- The Presence of Two Competent Witnesses

Long asserts that Smith was an incompetent witness such that the will should be declared void.  He emphasizes that Smith simultaneously (1) prepared Miller's will in a "slipshod fashion," (2) "was . . . a member of the County Commission before which the will would be probated," and (3) represented the estate.

West Virginia Code section 41-1-3 provides as follows respecting the witness requirement:

> No will shall be valid unless it be in writing and
> signed by the testator . . . and moreover . . . the
> signature shall be made or the will acknowledged by him
> in the presence of at least two competent witnesses,
> present at the same time; and such witnesses shall
> subscribe the will in the presence of the testator, and

14

of each other, but no form of attestation shall be
necessary.

W. Va. Code § 41-1-3.

It appears undisputed that Smith represented Miller
commencing on the day she consulted him respecting her will at
which time it was prepared by him and executed by her that same
day.  He then represented Blair during the probate proceedings
but he played no role in the County Commission's action
concerning the Miller will.  It seems inadvisable for the
drafting lawyer to witness the will he or she pens[6], especially
under the added circumstances here, but there is no indication

_____

[6]One commentator observed the perils of a lawyer acting in
such a dual capacity:

> The concerns that surround the practice of allowing
> attorneys to attest wills drafted by them or their
> firms are justifiable when one considers the role of
> the attesting witness. In their role, "attesting
> witnesses ideally should be able to give testimony as
> to essential elements of the two statutory issues of
> due execution and testamentary capacity sufficient, if
> credited by the jury, to prove both issues."

> In a probate contest, the lawyer's role as attesting
> witness may conflict with his role as draftsperson. The
> attorney's dual capacity may result in over-involvement
> in the client's affairs. Moreover, the attorney may
> face an ethical dilemma as a trial witness.

Sherwood J. Bien, The Connecticut Attorney as Draftsperson and
Attesting Witness to a Will: Connecticut Cases and New York
Considerations, 5 Conn. Prob. L.J. 331, 332 (1991).

anywhere in the law that doing so invalidates the will.  See,
e.g., In re Carpenter's Will, 145 N.Y.S. 365, 368 (N.Y. Sur.
1913); Blankner v. Lathrop, 159 N.E.2d 229, 230-231 (Ohio 1959);
Sullivant v. Sullivant, 364 S.W.2d 665, 667-668 (Ark. 1963); In
re Lomineck's Estate, 155 So.2d 561, 565 (Fla. App. 1963); In re
Wolfner's Estate, 188 N.E.2d 712, 714 (Ill. 1963); Yribar v.
Fitzpatrick, 393 P.2d 588, 592 (Idaho 1964); In re Gabriel's
Estate, 210 N.E.2d 597, 602 (Ill. App. 1965); In re Riley's
Estate, 479 P.2d 1, 20 (Wash. 1970); Matter of Giacomini's
Estate, 603 P.2d 218, 220 (Kan. App. 1979); Sherwood J. Bien,
supra at 335 ("A general review of case law indicates that courts
are favorable to taking the testimony of the drafting attorney
regarding the will in his capacity as attesting witness.  Indeed,
lack of attesting witness status might bar the draftsperson from
testifying about his will product.") (citing cases); 95 C.J.S.
Wills § 268 (Elec. ed. 2009) (citing cases) ("An attorney
employed and acting as the legal adviser of the testator, or who
drew the will under his or her instructions, is a competent
attesting witness. Likewise, an attorney representing the estate
is a competent attesting witness."); see 79 Am Jur. 2d Wills §
286 (Elec. ed. 2010) (citing cases) ("Attorneys at law are
competent to attest wills which they have drafted in accordance
with instructions received from their clients . . . .").

16

One learned commentator in the area has observed as follows:

> It is said that a competent witness to a will is a person who, at the time of making the attestation, was qualified to testify in court to facts which he attests by subscribing his name to the will.  While certain person were not competent at Common Law, most of the disqualifications have been removed by statute.
>
> . . . .
>
> In West Virginia, it is provided by statute that the executor named in a will is a competent witness as is a creditor of the testator.  There is [even] a specific provision concerning the competency of witnesses who are beneficiaries . . . .

1 James P. Cox, III, <u>Harrison on Wills and Administration for Virginia and West Virginia</u> § 9.08 (4th ed. 2007).

The statute identified by the author is West Virginia Code section 41-2-1, which indicates that a will is not void even if a beneficiary has witnessed the instrument:

> If a will be attested by a person to whom, or to whose wife or husband, any beneficial interest in any estate is thereby devised or bequeathed, if the will may not be otherwise proved such person shall be deemed a competent witness; but such devise or bequest shall be void, except that, if such witness would be entitled to any share of the estate of the testator, in case the will is not established, so much of his share shall be saved to him as shall not exceed the value of what is so devised or bequeathed. In case the will be contested any such attesting witness may, at the instance of any contestant, be required, either in court or by deposition, to testify as upon, and with the effect of, cross-examination; and the giving of such testimony or testimony in rebuttal thereto by such attesting

17

> witness, shall not, if the will be established or
> admitted to probate, affect in any manner the devise or
> bequest to such attesting witness, or to the wife or
> husband of such witness.

W. Va. Code § 41-2-1.

Based upon the foregoing discussion, and Long's inability to identify any case law or statutory authority to support invalidating the will on the grounds alleged, the court concludes that Blair is entitled to judgment as a matter of law as to Count One.[7]

B.    Count Two -- The Absence of Undue Influence

Blair next contends that Long has failed to raise a genuine issue for trial concerning Count Two.

In Syllabus Point 3 of <u>Milhoan v. Koenig</u>, 196 W. Va. 163, 164, 469 S.E.2d 99, 100 (1996), the Supreme Court of Appeals of West Virginia observed as follows:

> "In an action to impeach a will the burden of proving
> undue influence is upon the party who alleges it and
> mere suspicion, conjecture, possibility or guess that

---

[7]Long additionally appears to contend that Smith was incompetent to attest the will based upon his service on the County Commission or his putative failure to use best practices is drafting the instrument.  These contentions also appear to lack any foundation in the law.

18

> undue influence has been exercise[d] is not sufficient
> to support a verdict which impeaches the will upon that
> ground."

Id. (quoting Syl. Pt. 5, Frye v. Norton, 148 W. Va. 500, 135

S.E.2d 603 (1964)).  The decision in Milhoan additionally

observed that "'Undue influence, to avoid a will, must be such as

overcomes the free agency of the testator at the time of actual

execution of the will.'" Id. at 167, 469 S.E.2d at 103 (emphasis

added) (quoting Syl. Pt. 5, Stewart v. Lyons, 54 W. Va. 665, 665,

47 S.E. 442, 442 (1903)).[8]

---

[8]It has been observed in a few earlier undue influence
decisions as follows:

> [u]ndue influence, to invalidate a will, must be such
> influence as destroys the free agency of the testator
> and, in legal effect, amounts to force and coercion;
> but such force and coercion need not be physical or
> applied at any particular time.

Syl. Pt. 14, Ritz v. Kingdon, 139 W. Va. 189, 224, 79 S.E.2d 123,
142 (1953), overruled on other grounds, State v. Bragg, 140 W.
Va. 585, 87 S.E.2d 689 (1955) (emphasis added); Syl. Pt. 4, Ebert
v. Ebert, 120 W. Va. 722, 723, 200 S.E. 831, 832 (1938).  As
noted, this statement of the rule appears infrequently in the
reported West Virginia decisions.  It last appeared approximately
46 years ago in Frye v. Norton, 148 W. Va. 500, 135 S.E.2d 603
(1964).  The rule reflected in Milhoan, Stewart, and other
decisions has its genesis in both early and recent West Virginia
decisional law.  Compare Syl. Pt. 1, Forney v. Ferrell, 4 W. Va.
729, 729 (1871) ("Undue influence to avoid a will must be such as
to overcome the free agency of the testator at the time the
instrument was made."), with Milhoan v. Koenig, 196 W. Va. at
167, 469 S.E.2d at 103.  Based upon these considerations, the
court concludes the correct statement of the law is found in
Milhoan.

To prove undue influence that impeaches a will, "mere suspicion, conjecture, possibility or guess that undue influence has been exercise[d] is not sufficient . . . ." <u>Milhoan</u>, 196 W. Va. at 167, 469 S.E.2d at 103 (quoting Syl. Pt. 5, <u>Frye v. Norton</u>, 148 W. Va. 500, 500, 135 S.E.2d 603, 603 (1964). Undue influence can be shown through direct evidence, but is "generally shown by circumstantial evidence including advanced age, physical or mental infirmities, and a contrary disposition in prior wills." <u>Milhoan</u>, 196 W. Va. at 167, 469 S.E.2d at 103; Syl. Pts. 4 and 5, <u>Cale v. Napier</u>, 186 W. Va. 244, 245, 412 S.E.2d 242, 243 (1991).

The party asserting undue influence bears the burden of proving it. Syl. Pt. 5, <u>Frye v. Norton</u>, 148 W. Va. 500, 501, 135 S.E.2d 603, 604 (1964). The mere "opportunity for . . . undue influence is not, alone, sufficient" to establish its existence. Syl. Pt. 6, <u>Ebert</u>, 120 W. Va. at 722, 200 S.E. at 832. Indeed, the proof required is of the clear and convincing variety. <u>See</u> <u>Lutz v. Orinick</u>, 184 W. Va. 531, 534, 401 S.E.2d 464, 467 (1990) ("As a general rule, issues in a civil case are to be determined in accordance with the preponderance of the evidence. However, in certain classes of cases, such as those involving . . . charges of . . . undue influence . . . the stricter standard of

20

clear and convincing evidence is necessary.") (citations omitted).

      In an action instituted to set aside a contract, the supreme court of appeals observed as follows:

> Our Court has consistently held that influence acquired by reason of acts of kindness and attention, or love and affection do not constitute fraud or undue influence. <u>Delaplain v. Grubb</u>, 44 W.Va. 612, 30 S.E. 201 (1898); <u>Hale v. Cole</u>, 31 W.Va. 576, 8 S.E. 516 (1888).
>
>     . . . .
>
> Elderly people are frequently lonely and frequently find that their property gives them, for one reason or another, an opportunity to engage in human contact.
>
> Mrs. Trump was also competent enough to have learned the lesson of King Lear, namely that once the property is gone the solicitous attention of others may be gone as well. She retained a certain control over the property . . . in order to guarantee herself Mr. Ballard's continued affection. In this regard she was successful, as the evidence discloses that Mr. Ballard was faithful to her until the time of her death. Consequently, it would be most unfair to deny Mr. Ballard the bounty which Mrs. Trump legitimately sought to bestow upon him, and as a matter of law, the appellees were not entitled to the instruction on undue influence.

<u>Newell v. High Lawn Memorial Park Co.</u>, 164 W. Va. 511, 522 n.10, 523-24, 264 S.E.2d 454, 460 n.10, 460-61 (1980).  This same analytical approach seems to have seeped into West Virginia estate planning law.  <u>See</u>, <u>e.g.</u>, Syl. Pt. 17, <u>Ritz v. Kingdon</u>, 139 W. Va. at 192, 79 S.E.2d at 126 ("Influence which arises from

acts of kindness and attention to the testator, from attachment or love, from persuasion or entreaty, or from the mere desire to gratify the wishes of another, if free agency is not impaired, does not constitute, and is not alone sufficient to establish, undue influence.").

In view of this governing law and the evidentiary record developed thus far, Long's burden as to Count Two is a rigorous and demanding one.  It is apparent, however, that the additional discovery period relating to the added Count Three may impact the proper disposition of Count Two, especially insofar as Long alleges a confidential relationship between Blair and Miller.[9]

---

[9]The supreme court of appeals has observed that "'[a] power of attorney creates an agency and this establishes the fiduciary relationship which exists between a principal and agent.'" Napier v. Compton, 210 W. Va. 594, 598, 558 S.E.2d 593, 597 (2001) (quoted authority omitted).  The March 20, 2008, power of attorney that appointed Blair appears to be the only basis upon which Long grounds his allegation of a fiduciary relationship. Whether the power of attorney was thereafter used to, for example, create the joint bank account, number 0005877368078 opened June 6, 2008, remains to be seen.

Regarding the alleged confidential relationship, Long has offered little to no case law suggesting that the close personal relationship between Miller and Blair amounts to one of the confidential variety.  Should this matter come before the court again in a dispositive motion, Long should be prepared to provide the court legal authority, preferably from the supreme court of appeals, to support his contention.  The same is true of the suggestion that the newly added Count Three may be used to reach the three annuities in which Blair is named as a beneficiary rather than a co-owner.

The court, accordingly, ORDERS that the motion for summary judgment as to Count One be, and it hereby is, granted and as to Count Two be, and it hereby is, denied without prejudice.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED:  May 12, 2010

John T. Copenhaver, Jr.
United States District Judge